## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| D.V.D., *et al.*,<br>individually and on behalf of all others<br>similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>U.S. Department of Homeland Security,<br>*et al.*,<br><br>        Defendants. | Civil Action No.<br>25-10676-BEM |

## MEMORANDUM AND ORDER ON PLAINTIFFS' <u>MOTIONS FOR CLASS CERTIFICATION AND PRELIMINARY INJUNCTION</u>

**MURPHY, J.**

This case presents a simple question: before the United States forcibly sends someone to a country other than their country of origin, must that person be told where they are going and be given a chance to tell the United States that they might be killed if sent there? Defendants argue that the United States may send a deportable alien to a country not of their origin, not where an immigration judge has ordered, where they may be immediately tortured and killed, without providing that person any opportunity to tell the deporting authorities that they face grave danger or death because of such a deportation. All nine sitting justices of the Supreme Court of the United

States,[1] the Assistant Solicitor General of the United States,[2] Congress,[3] common sense,[4] basic decency, and this Court all disagree. Plaintiffs are seeking a limited and measured remedy—one Defendants have conceded in other proceedings is the minimum that comports with due process.[5] Plaintiffs are simply asking to be told they are going to be deported to a new country before they are taken to such a country, and be given an opportunity to explain why such a deportation will likely result in their persecution, torture, and/or death. This small modicum of process is mandated by the Constitution of the United States, and for this reason, the motion for class certification is GRANTED, and the motion for preliminary injunction is GRANTED in part.

---

[1] *Trump v. J.G.G.*, 604 U.S. —, 2025 WL 1024097, at *2 (Apr. 7, 2025) (*per curiam*) ("[N]otice must be afforded within a reasonable time and in such a manner as will allow [deportable aliens] to actually seek . . . relief in the proper venue before such removal occurs."); *see also id.* (Kavanaugh, J., concurring) ("[A]ll nine Members of the Court agree that judicial review is available.").

[2] Transcript of Oral Argument at 32–33, *Bondi v. Riley*, No. 23-1270 (S. Ct. Mar. 24, 2025) ("JUSTICE KAGAN: . . . [W]hen you have the order of removal but the [Convention Against Torture] proceedings have not yet been concluded, what does the government feel itself free to do with the alien? . . . [ASSISTANT TO THE SOLICITOR GENERAL]: We do think we have the legal authority to [send the non-citizen to some other country, assuming no pending claim under the Convention Against Torture as to that other country], with the following caveat: We would have to give the person notice of the third country and give them the opportunity to raise a reasonable fear of torture or persecution in that third country."); Transcript of Oral Argument at 20–21, *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021) ("JUSTICE KAGAN: So that's what it would depend on, right? That -- that you would have to provide [an individual being removed] notice [of what country he is being sent to], and if he had a fear of persecution or torture in that country, he would be given an opportunity to contest his removal to that country. Isn't that right? ASSISTANT TO THE SOLICITOR GENERAL: Yes, that's right.").

[3] *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005) (explaining that individuals who "face persecution or other mistreatment in the country designated" as their place of removal "have a number of available remedies," by statute, regulation, and under international law, to "ensur[e] their humane treatment"); Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681–822 (1998) (codified as Note to 8 U.S.C. § 1231) (codifying protections under the Convention Against Torture and prohibiting the removal of an alien to any country where they would likely be tortured); 8 U.S.C. § 1231(b)(3)(A); *see also* 8 C.F.R. §§ 208.16–18, 238.1, 241.8, 1208.16–18, 1240.11; 28 C.F.R. § 200.1 ("A removal order under Title V of the Act shall not be executed in circumstances that would violate Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.").

[4] "[C]ommon sense often makes good law." *Peak v. United States*, 353 U.S. 43, 46 (1957).

[5] *Supra* note 2.

# I. Background

## A. Legal Background

### 1. Removal Proceedings

When the Government wants to remove an individual, the normal path is through removal proceedings, requiring an evidentiary hearing before an Immigration Judge ("IJ"). 8 U.S.C. § 1229a. Removal proceedings determine not only *whether* an individual may be removed from the United States but also to *where* he may be removed. In the first instance, the alien is entitled to select a country of removal. *Id.*; 8 U.S.C. § 1231(b)(2)(A); 8 C.F.R. § 1240.10(f). If the alien does not do so, the IJ will designate the country of removal and may also designate alternative countries. 8 C.F.R. § 1240.10(f).

Meanwhile, the alien is also entitled to seek various protections, including asylum, withholding of removal, and Convention Against Torture ("CAT") protections. 8 C.F.R. § 1240.11(c)(1).[6] Some of these protections are discretionary.[7] Others are mandatory, meaning that protection must be given if the conditions are met. Withholding of removal is a mandatory form of protection preventing deportation to the country or countries where an IJ finds that the individual is more than likely to be persecuted. *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16; *see also Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013) ("[T]he Attorney General has no discretion to deny relief to a noncitizen who establishes his eligibility [for withholding of removal or CAT protections]."). CAT protection is a mandatory protection against deportation to a country where the IJ finds that the individual is likely to be tortured. *See* Foreign Affairs Reform and

---

[6] Technically, CAT protections can be a form of withholding. *See Guzman Chavez*, 594 U.S. at 530. The Court uses the phrase "withholding of removal" to refer to what has been called "statutory withholding." *Id.*

[7] For example, asylum, which protects against deportation generally to any country, is discretionary absent certain exceptions. *See generally* 8 U.S.C. § 1158; 8 C.F.R § 208.2.

Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681–822 (1998) (codified as Note to 8 U.S.C. § 1231); 8 C.F.R. §§ 208.16–18, 1208.16–18; 28 C.F.R. § 200.1; *see also Moncrieffe*, 569 U.S. at 187 n.1.

## 2. Reinstatement or Withholding-Only Proceedings

Alternatively, the U.S. Department of Homeland Security ("DHS") may reinstate a prior order of removal for an alien it finds "has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal." 8 U.S.C. § 1231(a)(5). When DHS reinstates a removal order, the "prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed." *Id.* DHS may also issue administrative removal orders to individuals whom DHS determines are not lawful permanent residents and who have an aggravated felony conviction. *See* 8 U.S.C. § 1228(b); 8 C.F.R. § 238.1.

While in both processes aliens are barred from pursuing nearly all avenues of relief from removal, aliens may still seek protection through withholding of removal under 8 U.S.C. § 1231(b)(3) and CAT. 8 C.F.R. §§ 238.1(f)(3), 241.8(e). If the alien demonstrates a reasonable fear of persecution or torture, the alien is placed in "withholding-only proceedings" before an IJ where they can only seek withholding of removal and/or CAT protection. 8 C.F.R. §§ 208.31(b), (e); *see also* 8 U.S.C. § 1231(a)(5) (providing that an alien subject to reinstatement "is not eligible and may not apply for any relief under [the Immigration and Nationality Act ("INA")]"); 8 C.F.R. § 1208.2(c)(3)(i) ("The scope of review in [withholding-only] proceedings . . . shall be limited to a determination of whether the alien is eligible for withholding or deferral of removal."[8]).

---

[8] Deferral of removal provides CAT protections to aliens who are mandatorily ineligible for withholding of removal. *See* 8 C.F.R. § 208.17(a).

Withholding of removal and CAT protection only affect to *where* the alien may be removed, rather than *whether* the alien may be removed; thus, even if an alien prevails on his withholding or CAT claim, the removal order remains valid and enforceable, albeit not executable to the specific country as to which the alien has demonstrated a likelihood of persecution or death. *See* 8 U.S.C. § 1231(b)(2)(E); 8 C.F.R. § 1208.16(f); *Johnson v. Guzman Chavez*, 594 U.S. 523, 536 (2021); *Lanza v. Ashcroft*, 389 F.3d 917, 933 (9th Cir. 2004) (stating that a grant of withholding "only prohibits removal of the petitioner to the country of risk, but does not prohibit removal to a non-risk country").

### 3.    Third-Country Removals

Because the removal proceedings happen on one track, while withholding and CAT proceedings happen on another track, a situation may arise where the Government has an order of removal but no country that an IJ has authorized for that removal.

In certain circumstances, where the Government may not remove an alien to any country covered by that alien's order of removal, the Government may still remove the alien to any "country whose government will accept the alien into that country." 8 U.S.C. § 1231(b)(2)(E)(vii). These are called "third-country removals." As relevant here, a specific carve-out prohibits deportation to countries in which the alien would face persecution or torture:

> Notwithstanding paragraphs [b](1) and [b](2), the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1231(b)(3)(A). Similarly, under FARRA,[9] which codified CAT protections, an alien may not be removed to any country where they would be tortured. *See* 28 C.F.R. § 200.1; 8 C.F.R.

---

[9] *See supra* note 3.

§§ 208.16–18, 1208.16–18.  In other words, third-country removals are subject to the same mandatory protections that exist in removal or withholding-only proceedings.

**B.  Factual Background**

**1.  The February 18, 2025 Directive and March 30, 2025 Guidance**

On January 20, 2025, President Donald J. Trump issued Executive Order 14165, entitled "Securing our Borders."  90 Fed. Reg. 8467.  As relevant here, on or about February 18, 2025, DHS issued a directive to the Enforcement and Removal Operations ("ERO") division of Immigration and Customs Enforcement ("ICE").  Dkt. 1-4 (the "February Directive").  The February Directive instructs ERO officers to review the cases of aliens granted withholding of removal or protection under CAT "to determine the viability of removal to a third country and accordingly whether the alien should be re-detained" and, in case of persons who previously could not be removed because the designated countries were unwilling to receive them, "review for re-detention . . . in light of the Administration's significant gains with regard to previously recalcitrant countries and the potential for third country removals."  *Id.* at 2.

On March 23, 2025, Plaintiffs filed this lawsuit challenging, in part, the February Directive. Dkt. 1 ("Compl.").  Plaintiffs seek an order guaranteeing them the opportunity to show—before being removed to countries not included on their removal orders—that they will suffer persecution, torture, and/or death in those countries.  They are challenging Defendants' policy or practice of designating aliens for removal to any country other than the country or alternative country of removal designated and identified in writing in their prior immigration proceedings without first providing notice and an opportunity to apply for protection from removal to that "third" country.

On March 28, 2025, the Court entered a temporary restraining order after hearing oral arguments from both parties.[10]  Dkt. 34.

On March 30, 2025, DHS issued an updated guidance (the "March Guidance") on removals to third countries.  Dkt. 43-1.  This guidance dictates that aliens may be removed to a third country without notice if the United States has received assurances from that country that aliens removed from the United States will not be persecuted or tortured.  *Id.* at 2–3.  Importantly, these assurances are not individualized, and the March Guidance provides for no review, meaning that deportations to a third country can occur without any consideration of the individual risks facing a particular alien.  *Id.*  According to the March Guidance, DHS will provide the alien with notice of the third country (and an opportunity to affirmatively assert a fear of return to that third country) only if the United States has not received assurances, or if the Department of State does not believe those assurances to be credible.  *Id.* at 3.

### 2. <u>Plaintiffs' Cases</u>

Plaintiffs are individuals subject to final orders of removal, allegedly at imminent risk of deportation to countries other than those authorized by their respective orders.  Compl. ¶ 1.[11]

Plaintiff D.V.D.[12] is a citizen of Cuba who entered the United States from Mexico.  *Id.* ¶¶ 10, 62.  In February 2017, in removal proceedings, he was ordered removed.  *Id.* ¶ 62.  His removal order specified only Cuba as the country of removal.  *Id.*  He was released from detention on an Order of Supervision in May of 2017.  *Id.*  Plaintiffs allege that on March 10, 2025, ICE instructed D.V.D.'s attorney that D.V.D. needed to report for an in-person check-in on March 28,

---

[10] The Court extended the temporary restraining order after hearing further oral arguments from both parties on April 10, 2025.  Dkt. 62.

[11] Except where indicated, the relevant facts are largely undisputed.

[12] The Court has allowed Plaintiffs to proceed under pseudonyms.  Dkt. 13.

2025, and that the ICE officer later explained that ICE was requiring all people to report in person and more frequently on a case-by-case basis. *Id.* ¶¶ 64–66. If deported to a third country, D.V.D. alleges that he is at risk of persecution due to his mental health conditions or possible imprisonment in certain countries. *Id.* ¶ 67. At oral argument on March 28, 2025, counsel indicated that D.V.D. had not been detained at that day's check-in and had been given another check-in date in September 2025. Dkt. 44 ("March 28, 2025 Tr.") at 4:24–25.

Plaintiff M.M. is a citizen of Honduras who fled due to severe domestic violence. Compl. ¶¶ 11, 68. In 2014, because she had previously been ordered removed from the United States, DHS issued a reinstatement order. *Id.* ¶ 69. In withholding-only proceedings before an IJ in 2021, she was granted withholding of removal to Honduras. *Id.* ¶¶ 69–70. M.M. is not in ICE custody, but she alleges that on March 7, 2025, an ICE officer informed her that she was on a list of people who would be deported imminently. *Id.* ¶ 71. If deported to a third country, M.M. alleges that she is at risk of being sent back to Honduras or another country where she would again face severe domestic violence. *Id.* ¶ 73. At oral argument on April 10, 2025, counsel indicated that M.M.'s check-in had been cancelled by ICE after the initiation of this suit. April 10, 2025 Rough Tr. at 1:19–21.

Plaintiff E.F.D. is a citizen of Ecuador. Compl. ¶¶ 12, 74. In October 2015, he was placed in removal proceedings after entering the United States and raising a credible fear of return. *Id.* In 2018, in removal proceedings, an IJ granted E.F.D.'s application for CAT protection. *Id.* ¶ 75. On March 18, 2025, ICE re-detained him. *Id.* ¶¶ 12, 76. He has not yet been told when his removal might happen or to where. *Id.* ¶¶ 76–77. E.F.D. alleges that he will be deported to a third country without the opportunity to apply for protection, which could include countries that will deport him

back to Ecuador, from which he was awarded CAT protection, or to countries where he has had prior dangerous experiences. *Id.* ¶ 77.

Plaintiff O.C.G. is a native of Guatemala who was issued an expedited removal order pursuant to 8 U.S.C. § 1225(b) and deported to Guatemala in March 2024, without a credible fear interview. *Id.* ¶¶ 13, 78. In May of 2024, he reentered the United States, through Mexico, after experiencing violence in Mexico. *Id.* ¶¶ 79–80. His removal order was reinstated by DHS, but he was referred to an asylum officer based on his expressed fear of returning to Guatemala. *Id.* ¶ 80. He was then placed in withholding-only proceedings before an IJ and was granted withholding of removal to Guatemala under 8 U.S.C. § 1231(b)(3). *Id.* ¶¶ 80–82. Plaintiffs allege that the IJ did not designate Mexico as a country of removal and that, when DHS tried to add Mexico during the withholding-only proceedings, the IJ told DHS that it was "too late" to do so. *Id.* ¶¶ 81–83. DHS waived appeal. *Id.* ¶ 84. Despite this success, O.C.G. remained in detention and was quickly deported to Mexico. *Id.* ¶¶ 85–86. The parties dispute whether he was provided an opportunity to express fear prior to being deported to Mexico. *Compare id.* ¶¶ 85–86 (complaint alleging that no notice or opportunity to be heard was provided), *and* Dkt. 8-4 ¶¶ 8–10 (declaration of O.C.G. asserting same), *with* Dkt. 31-1 ¶ 13 (declaration of Brian Ortega, Assistant Field Office Director of ICE's ERO Phoenix Field Office, asserting that notice was provided on the day of his removal, and fear of removal to Mexico was expressly denied). Plaintiffs allege that O.C.G. was taken to Mexico by bus and that, once he was placed in detention in Mexico, he was informed by Mexican authorities that he could apply for asylum in Mexico—and remain incarcerated for an unknown period of time while that application was pending—or be returned to Guatemala. Compl. ¶¶ 87–88. Plaintiffs allege that, on February 25, 2025, O.C.G. returned to Guatemala, where he remains in hiding today. *Id.* ¶ 89.

Each Plaintiff alleges that he or she has valid reasons to fear removal to specific countries that were not included in their removal orders. *Id.* ¶¶ 67, 73, 77, 88. Plaintiffs challenge Defendants' policy or practice of failing to provide notice and an opportunity to be heard prior to removal to a country that was not designated in their removal orders, which Plaintiffs allege violates the INA, FARRA, regulations implementing the two statutes, and the Due Process Clause of the Fifth Amendment. *Id.* ¶¶ 99–138.

### 3. **Current Motions**

Before the Court now are Plaintiffs' Motion for Class Certification, Dkt. 4, and Motion for a Preliminary Injunction, Dkt. 6,[13] through which Plaintiffs seek: (1) to prevent Defendants from removing certain of the named Plaintiffs to a "third" country without notice and an opportunity to assert fear of persecution or torture; (2) to prevent Defendants from removing any class member to a "third" country without notice and an opportunity to assert fear of torture; and (3) an order directing Defendants to facilitate the immediate return of O.C.G. to the United States. For the reasons set forth below, Plaintiffs' motion for class certification is GRANTED, and Plaintiffs' motion for a preliminary injunction is GRANTED in part.

---

[13] The Court has already ruled on the motion to the extent it sought a temporary restraining order, and as stated on the record in the March 28, 2025 hearing, the Court denies the motion to the extent it seeks an administrative stay of the February Guidance.

## II.    <u>Jurisdiction</u>

Several subsections of 8 U.S.C. § 1252 limit judicial review of claims and questions that relate to removal proceedings or existing orders of removal. Defendants argue that sections 1252(a), (b), and (g) strip this Court of jurisdiction.[14]

### A.    <u>Sections 1252(a) and (b)</u>

In the REAL ID Act of 2005, Congress amended the INA to limit the ways by which an individual might challenge his order of removal. *Singh v. Gonzales*, 499 F.3d 969, 977 (9th Cir. 2007) (citing 8 U.S.C. § 1252(a)(5)).[15] In turn, section 1252(b)(9) limits the forum for those challenges to courts of appeals. *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016).[16]

Accordingly, actions that do not challenge final orders of removal are not subject to this channeling scheme. *J.E.F.M.*, 837 F.3d at 1032. "[A] suit brought against immigration authorities

---

[14] Defendants also argue that section 1252(f)(1) limits this Court's jurisdiction with respect to class-wide relief. However, in *Biden v. Texas*, 597 U.S. 785 (2022), the Supreme Court explicitly confirmed that section 1252(f)(1) concerns the availability of relief, not subject matter jurisdiction. *Id.* at 800–01. As the Court explained, "the question whether a court has jurisdiction to grant a particular remedy is different from the question whether it has subject matter jurisdiction over a particular class of claims." *Id.* at 801. While the provision may "withdraw[ ] a district court's 'jurisdiction or authority' to grant a particular form of relief[,] [i]t does not deprive the lower courts of all subject matter jurisdiction over claims brought under sections 1221 through 1232 of the INA." *Id.* at 798; *see also Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (addressing the merits of the suit because "[w]hether the [District] [C]ourt had jurisdiction to enter such an injunction [under section 1252(f)(1)] is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' [class-wide] request for declaratory relief"). As discussed below, the Court has jurisdiction to grant both the class-wide declaratory and injunctive relief sought in this case. *See infra* at 23–27.

[15] In pertinent part, section 1252(a)(5) states:

[A] petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter[.]

[16] Section 1252(b)(9) states:

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

is not *per se* a challenge to a removal order." *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011).

The Supreme Court has expressly affirmed this proposition, explaining that the phrase "arising from" in section 1252(b)(9) does not encompass all claims that merely result from the fact of or potential for removal, which reading the Court said would have "staggering results." *Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018). Because the respondents in *Jennings* were "not asking for review of an order of removal," "not challenging the decision to detain them in the first place or to seek removal," and "not even challenging any part of the process by which their removability will be determined," the Court concluded that the restriction in section 1252(b)(9) did not apply. *Id.* Notably, under *Jennings*, an individual is not required to "cram[]" claims into the judicial review of a removal order where doing so would be unnatural.[17] *Id.*

The First Circuit has had further opportunity to clarify that the scope of section 1252(b)(9) is limited to claims that specifically arise out of what happens in the removal proceeding:

> [R]emoval proceedings are confined to determining whether a particular alien should be deported. *See* [8 U.S.C.] § 1229a(c)(1)(A). While legal and factual issues relating to that question can be raised in removal proceedings and eventually brought to the court of appeals for judicial review, certain claims, by reason of the nature of the right asserted, cannot be raised efficaciously within the administrative proceedings delineated in the INA. *See, e.g., McNary* [*v. Haitian Refugee Ctr., Inc.*], 498 U.S. [479,] 496, 111 S.Ct. 888 [(1991)]; *Jupiter v. Ashcroft*, 396 F.3d 487, 492 (1st Cir. 2005). Requiring the exhaustion of those claims would foreclose them from any meaningful judicial review. Given Congress's clear intention to channel, rather than bar, judicial review through the mechanism of

---

[17] Even if an individual raised claims related to the risk of torture in a third country, the IJ would not normally consider or address such claims unless that country had already been designated as a country of removal. *See infra* at 16–17 & note 24; *see also, e.g.*, Compl. ¶¶ 81–83 (alleging that, when DHS sought to add Mexico during O.C.G.'s withholding-only proceedings, the IJ told DHS that it was "too late" to do so); Dkt. 8-4 ¶¶ 5–7 (declaration of O.C.G. that the IJ did not designate Mexico as a country of removal and that the IJ informed DHS that Mexico was not a country for removal during the withholding-only proceedings); Dkt. 8-11 at 5–6 (motion to reopen denied despite third country identified for removal); Dkt. 59-12 at 4 (motion to reopen denied where removal to third country was speculative, and indicating that even if third country were identified for removal, relief would need to be sought in federal court rather than in immigration proceedings); Dkt. 59-13 at 4 (motion to reopen denied as premature where "Respondent was not seeking protection from removal to any particular country").

section 1252(b)(9), reading "arising from" as used in that statute to encompass those claims would be perverse.

*Aguilar v. U.S. Immigr. & Customs Enf't*, 510 F.3d 1, 11 (1st Cir. 2007). As such, "claims which cannot be raised in removal proceedings and eventually brought to the court of appeals on a petition for review are 'independent of, or wholly collateral to, the removal process,' not 'arising from' it." *Gicharu v. Carr*, 983 F.3d 13, 16 (1st Cir. 2020) (quoting *Aguilar*, 510 F.3d at 11).[18]

In examining Plaintiffs' requested relief, the issues in this case extend beyond those that could have been raised in their removal proceedings. This largely follows from the simple fact that Plaintiffs are no longer in removal proceedings and complain only of actions that post-date their removal proceedings. Plaintiffs neither challenge the IJs' determinations that they are removable nor claim any deficiency in the removal orders themselves. *Cf. Delgado*, 643 F.3d at 55 (challenging adjustment of status, which would necessarily render removal order "invalid"); *Aguilar*, 510 F.3d at 13–14 (challenging right to counsel in removal proceedings). Rather, Plaintiffs' claims do quite the opposite of challenge their orders of removal—they seek to hold Defendants to the terms of those orders and to receive notice and an opportunity to be heard before Defendants explicitly exceed those orders. *See Aden v. Nielsen*, 409 F. Supp. 3d 998, 1006 (W.D. Wash. 2019) (finding claims that "challenge[d] DHS's attempts, *outside* of removal proceedings, to designate [a third country] without reopening his proceedings so that an IJ could make the designation in the first instance and/or determine whether petitioner's life or freedom would be

---

[18] In reaching its decision in *Aguilar*, the First Circuit cited and relied upon decades of Supreme Court precedent that is "hostil[e] toward requiring exhaustion when adequate relief could not feasibly be obtained through the prescribed administrative proceedings." *Aguilar*, 510 F.3d at 12 (citing *Leedom v. Kyne*, 358 U.S. 184, 190 (1958), *Matthews v. Eldridge*, 424 U.S. 319, 330–31 (1976), *Bowen v. City of New York*, 476 U.S. 467, 482–83 (1986), and *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994)).

threatened in that country" independent of removal order and thus not barred by section 1252(a)(5)).[19]

Defendants propose that Plaintiffs can "cram," *Jennings*, 583 U.S. at 294, their fear-based claims into the removal proceedings (thereby placing those claims into section 1252's jurisdictional funneling scheme) by filing motions to reopen their immigration proceedings. Dkt. 51 ("PI Opp.") at 8–9. But this Court finds that remedy to be both legally insufficient and logistically impossible, effectively "foreclos[ing] all meaningful judicial review." *See Aguilar*, 510 F.3d at 12 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994)).[20]

For most aliens, directly moving to reopen is simply not an option. "With a few narrow exceptions, the Immigration and Nationality Act limits petitioners to a single motion to reopen

[19] Although this case involves sensitive subject matter and complex statutory schemes, its underlying principles are surprisingly familiar. Courts routinely consider whether jurisdiction is barred based on a prior court's order. *See, e.g.*, *Verogna v. Johnstone*, 583 F. Supp. 3d 331, 336–37 (D.N.H. 2022), *aff'd*, 2022 WL 19795808 (1st Cir. Nov. 14, 2022). Under sections 1252(a)(5) and (b)(9), district courts are precluded from revisiting orders made by immigration judges. It would not make sense, however, to offer that same protection for acts that go beyond those orders' preclusive scope.

[20] Defendants claim that an alien can raise fear-based concerns through reopening IJ proceedings or petitioning the court of appeals for review. *E.g.*, April 10, 2025 Rough Tr. at 9:24–10:5 ("MR. ENSIGN: Your Honor, they would have needed to raise it earlier or -- and if we were in the second part of the [March] guidance, they also could manifest fear at that point and then it would go to screening. So there's that potentially available as well. But, you know, to the extent they have awareness of that now, they should go back before the IJ and BIA."); *id.* at 10:19–22 ("MR. ENSIGN: Your Honor, they would have needed to go to the BIA before [they are notified of third-country removal plans]. There's nothing under the [March] guidance that would require additional notice or an opportunity to challenge it at that moment."); *id.* at 27:10–13 ("[MR. ENSIGN:] There is -- the typical way it . . . would be raised is a motion to reopen if you haven't raised it already, and then you can raise it to the Court of Appeals."); *id.* at 44:2–11 ("THE COURT: So it happens Saturday morning, the person raises a fear that department disagrees -- they make it through the first screening, the department disagrees. That person is then going to be deported on Sunday morning. As a practical matter, there's no judicial review of that decision, right? MR. ENSIGN: There would be administrative review potentially in the IJ. THE COURT: How would they do that? It's Saturday. MR. ENSIGN: Your Honor, I don't know the specifics of the IJ proceedings."). This claim is either an effort to prevaricate or is deeply disingenuous. The suggestion that an alien must—or even can—reopen an immigration proceeding at 6:00 a.m. on a Saturday prior to being removed that same weekend is preposterous on its face. *See, e.g.*, Exec. Office for Immigr. Rev., *Boston Immigration Court*, U.S. Dep't of Just., https://www.justice.gov/eoir/boston-immigration-court (last updated Apr. 9, 2025) ("The immigration court is open Monday to Friday except for federal holidays."). Further, Defendants have provided no evidence or authority—only their own argument—that there is a way for Plaintiffs to *successfully* reopen their immigration proceedings as of right and do not address Plaintiffs' well-supported contention that motions to reopen to assert fear of removal to a country not designated in their removal order are routinely denied as speculative. *See* PI Opp. at 8–9 (discussing only sua sponte motions to reopen process). Defendants' contention is belied by both the evidence in the record and clear case law on the limits of sua sponte motions to reopen. *See infra* at 14–18.

filed within ninety days of a removal order." *Charles v. Garland*, 113 F.4th 20, 23 (1st Cir. 2024) (citing 8 U.S.C. § 1229a(c)(7)(A), (c)(7)(C)(i); 8 C.F.R. § 1003.2(c)(2)). In the absence of any right to reopen the underlying immigration case, the petitioner can only ask the immigration court to reopen "sua sponte." *Id.* Immigration courts have nearly unfettered "discretion to decide whether to grant or deny sua sponte reopening." *Id.*; *see also Phimmady v. Bondi*, 128 F.4th 18, 23 (1st Cir. 2025) (holding that judicial review of immigration court's decision not to reopen sua sponte is limited and that there is no legal error in declining to reopen where plaintiff could not establish settled practice of reopening cases sua sponte in similar circumstances). Consistent with this, Plaintiffs have provided sworn declarations indicating that their various attempts at reopening proceedings to seek CAT protections have been denied by IJs. *See* Dkt. 8-8 ¶ 9 (explaining that an IJ denied motion to reopen); Dkt. 8-18 ¶ 5 (same); Dkt. 8-11 at 5–6 (IJ order denying motion to reopen and noting that neither "Immigration Judges nor the Board of Immigration Appeals ha[s] jurisdiction to review any determination by officers of the DHS under 8 C.F.R. § 241.15 regarding the country of removal. Nothing in this order forbids DHS from acting on its own authority to designate a country, or forbids the parties from litigating that issue in any forum outside of the Executive Office of Immigration Review" (citations omitted)); Dkt. 59-12 ¶¶ 12–18 ("If the United States government were to remove Respondent to El Salvador under a separate authority, that is outside the jurisdiction of this Court to adjudicate and/or analyze. Respondent's relief would be

sought in Federal court, not Immigration Court.");[21] Dkt. 59-13 at 4 (IJ order denying motion to reopen as premature where "Respondent was not seeking protection from removal to any particular country").[22] *But see* Dkt. 8-14 ¶ 7 (noting that an IJ granted a motion to reopen proceedings for an alien currently in detention).[23]

Even where an alien may move as of right, or in the unlikely event that the immigration court reopens the case sua sponte, there is no reason to believe that the court will entertain such preemptive CAT and withholding claims. "[A]n applicant is not entitled to have the agency adjudicate claims of relief that relate 'to a country that nobody is trying to send them to.'" *Sadychov v. Holder*, 565 F. App'x 648, 651 (9th Cir. 2014) (quoting *She v. Holder*, 629 F.3d 958, 965 (9th Cir. 2010), *superseded on other grounds by statute as stated in Dai v. Sessions*, 884 F.3d

---

[21] The full reasoning for the IJ's denial states:

First, country conditions in El Salvador are not relevant to Respondent's case. Respondent was ordered removed by this court to his country of origin, Venezuela - not El Salvador.

Second, Respondent's fear of removal to El Salvador as a 'Venezuelan national with Tattoos' is tentative and speculative, at best. Respondent has been ordered removed to Venezuela by this Court, not El Salvador. If the United States government were to remove Respondent to El Salvador under a separate authority, that is outside the jurisdiction of this Court to adjudicate and/or analyze. Respondent's relief would be sought in Federal court, not Immigration Court, when and if that issue became ripe for review.

Dkt. 59-12 at 4.

[22] There are further substantive and logistical barriers to filing motions to reopen, especially for pro se and detained aliens and those with limited English proficiency, and particularly where removals are executed unexpectedly and with great haste. *See* Dkt. 59-9 (describing procedural, evidentiary, and substantive barriers to filing motions to reopen, especially for pro se and detained noncitizens given limitations on communication and mail access in immigration detention, as well as the impossibility of seeking reopening without knowledge of the country to which someone will be deported); Dkt. 59-10 (same, and highlighting that pro se individuals are unlikely to be aware of the availability of motions to reopen as a procedural mechanism); Dkt. 59-11 (same, and highlighting difficulties for detained individuals with limited English proficiency and the likelihood of deportation while a motion to reopen is pending).

[23] Moreover, as a practical matter, even if Plaintiffs could viably seek to reopen their immigration proceedings without knowing where the Government intends to send them, Plaintiffs would then need to make separate cases for each and every potential country for which they might have a fear-based claim to avoid removal. It is hard to imagine that this solution, which would dramatically clog the immigration courts—and would seem to pose an even greater hindrance to Defendants' removal efforts than providing the sought-after notice in the first place—is what Congress intended.

858, 867 n.8 (9th Cir. 2018)) (explaining that "should circumstances change such that Azerbaijan is the designated country of removal, the agency must provide [plaintiff] with notice and an opportunity to reopen his case for full adjudication of his claim of withholding of removal from Azerbaijan"). Until an individual receives notice of the country to which he is being deported, he has no basis for reopening his immigration case and no merits basis to seek withholding from a hypothetical third country.[24]

The inability to effectively raise preemptive CAT and/or withholdings claims before an IJ precludes meaningful review in courts of appeals. That is so because courts of appeals are limited to the administrative record, 8 U.S.C. § 1252(b)(4)(A), and are thus, at most, able to review the IJ's discretionary decision not to reopen the case or adjudicate hypothetical claims, which—when the motion or request concerns "a country that nobody is trying to send them to," *Sadychov*, 565 F. App'x at 651—is not wrongly decided. *See id.* But even that may overstate the review available to petitioners. Multiple circuits have held that courts of appeals lack *any* jurisdiction to review discretionary decisions to reopen. *See, e.g.*, *Manyary v. Bondi*, 129 F.4th 473, 479 (8th Cir. 2025) (calling due-process argument raised through request to reopen sua sponte "'an abuse of discretion argument in constitutional garb'" (quoting *Tamenut v. Mukasey*, 521 F.3d 1000, 1005 (8th Cir. 2008))); *Mosere v. Mukasey*, 552 F.3d 397, 400 (4th Cir. 2009); *see also Tamenut*, 521 F.3d at

---

[24] For this reason, the Court has declined to distinguish between those whose removal or withholding-only proceedings conclude before versus after entrance of this Court's Order. *See* April 10, 2025 Rough Tr. at 16:5–23 (considering the idea). Whichever countries or fear-based claims an alien may attempt to raise during proceedings, IJs are under no obligation to make findings about countries not previously identified as "proposed countr[ies] of removal." *See* 8 C.F.R. § 1208.16(b) (defining eligibility with respect to that limited subset); *id.* § 1240.11(c)(1) (instructing IJs to advise aliens that they may apply to that subset (citing 8 C.F.R. § 1240.10)). Imposing a before-and-after distinction would require crafting a new, burdensome system for how immigration courts identify countries of removal and adjudicate related claims.

1004 (citing cases from ten circuits).[25]  Indeed, just over two months ago, the First Circuit openly doubted (and declined to resolve) whether it had jurisdiction to review the denial of a request to reopen involving consideration of factual circumstances.  *Phimmady*, 128 F.4th at 22 & n.2 (highlighting that the "Supreme Court has 'express[ed] no opinion on whether federal courts may review [a] decision not to reopen removal proceedings.'" (quoting *Kucana v. Holder*, 558 U.S. 233, 251 n.18 (2010)) (first alteration in *Phimmady*)).[26]  Accordingly, such preemptive CAT and/or withholding claims, including the due-process issues raised in this case, are precisely the type of "claims which cannot be raised in removal proceedings and eventually brought to the court of appeals on a petition for review" that the First Circuit has held are "'independent of, or wholly collateral to, the removal process,' not 'arising from' it."  *See Gicharu*, 983 F.3d at 16 (quoting *Aguilar*, 510 F.3d at 11).

Finally, Defendants argue that "Congress, in its discretion, implemented [CAT] by directing the issuance of regulations, expressly depriving courts of jurisdiction to review those regulations, and channeling all review of individual CAT claims into review of final orders of

---

[25] Several of these cases appear to have since been superseded, *see, e.g.*, *Thompson v. Barr*, 959 F.3d 476 (1st Cir. 2020), or qualified in later decisions, *see, e.g.*, *Arzu-Robledo v. Garland*, 2023 WL 6532649, at *2 (5th Cir. Oct. 6, 2023).

[26] Even assuming jurisdiction, *Phimmady* gives a strong sense of just how unreviewable, on the merits, these motions to reopen really are.  In *Phimmady*, an alien sought to reopen his immigration case after the conviction that had rendered him removable was overturned.  128 F.4th at 20.  The Board of Immigration Appeals ("BIA") denied the motion to reopen, and the First Circuit affirmed.  *Id.* at 25.  Although prior BIA decisions had established that reopening was "'an extraordinary remedy reserved for truly exceptional situations,'" *id.* at 22 (quoting *In re G-D-*, 22 I. & N. Dec. 1132, 1133-34 (BIA 1999)), nothing required reopening, "[e]ven in truly exceptional situations," *id.* (citing *Charles*, 113 F.4th at 23).  As such, the First Circuit held that there is no legal error in the denial of a sua sponte motion to reopen unless a plaintiff shows that the BIA violated an established practice of granting similar sua sponte motions.  *Id.* at 23.

removal."[27]  PI Opp. at 10 (citing FARRA § 2242(d); 8 U.S.C. § 1252(a)(4)).  But this argument runs squarely up against the overall problem with Defendants' reading of the statute—there can be no meaningful "review" of an issue that was not *and could not* have been raised in the first place.  As the Supreme Court held in *Jennings* and the First Circuit confirmed in *Aguilar*, section 1252(a)(4) cannot be read to strip jurisdiction over claims that could not have been raised in the removal proceedings.  *See also E.O.H.C. v. Sec'y U.S. Dep't of Homeland Sec.*, 950 F.3d 177, 188–90 (3d Cir. 2020) (holding that section 1252(a)(4) does not bar review "[w]hen a detained alien seeks relief that a court of appeals cannot meaningfully provide on petition for review of a final order of removal").  As Defendants initiated the third-country-removal process at issue *after* the conclusion of removal proceedings—and because Plaintiffs have no opportunity to raise these issues before an IJ without some type of advance notice—there can be no judicial review as contemplated in the channeling provisions of section 1252(a)(4).  *See also Compere v. Nielsen*, 358 F. Supp. 3d 170, 177 n.8 (D.N.H. 2019) (finding section 1252(a)(4) "plainly inapplicable" where the petitioner was not seeking review of CAT claim's denial).  As such, neither section 1252(a) nor section 1252(b) bars this Court's jurisdiction.

---

[27] Defendants also highlight that CAT "is not self-executing."  PI Opp. at 10.  But CAT "has been implemented in the United States through FARRA and the subsequent regulations."  *See Saint Fort v. Ashcroft*, 329 F.3d 191, 195–96 (1st Cir. 2003) (explaining how the Convention Against Torture was domesticated into federal law), *superseded by statute on other grounds as stated in Hamid v. Gonzales*, 417 F.3d 642, 647 (7th Cir. 2005); *see also Nasrallah v. Barr*, 590 U.S. 573, 580 (2020).  As courts do, this Court uses "CAT" to refer to the processes and protections as embodied in the law.  *See, e.g., Guzman Chavez*, 594 U.S. at 530–31.

## B.    Section 1252(g)

The Supreme Court has explained that 8 U.S.C. § 1252(g)[28] is "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 485 & n.9 (1999) [hereinafter *AADC*] ("Section 1252(g) seems clearly designed to give some measure of protection to . . . discretionary determinations.").    In *AADC*, the Supreme Court emphasized that the provision does not encompass the universe of all possible acts and events arising from removal proceedings, but rather instructs courts to read it as a narrow provision that "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'"    *Id.* at 482 (emphases in original) (quoting section 1252(g) and declining to read it so expansively as to say, "no judicial review in deportation cases unless this section provides judicial review").    Accordingly, section 1252(g) does not refer to "all claims arising from deportation proceedings."    *Id.*

Following *AADC*, the First Circuit has held that section 1252(g) does not bar review of the "lawfulness" of a removal-related action because such claims are "collateral" to the discretionary decisions immunized by section 1252(g).    *Kong v. United States*, 62 F.4th 608, 617 (1st Cir. 2023); *accord United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (*en banc*) ("The district court may consider a purely legal question that does not challenge the Attorney General's discretionary authority, even if the answer to that legal question—a description of the relevant law—forms the backdrop against which the Attorney General later will exercise discretionary

---

[28] 8 U.S.C. § 1252(g) states, in pertinent part:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

authority."); *Madu v. U.S. Att'y Gen.*, 470 F.3d 1362, 1368 (11th Cir. 2006) ("While this provision bars courts from reviewing certain exercises of discretion by the attorney general, it does not proscribe substantive review of the underlying legal bases for those discretionary decisions and actions."); *Bowrin v. U.S. INS*, 194 F.3d 483, 488 (4th Cir. 1999) (holding that section 1252 "does not apply" to Government's interpretations of law); *see also Texas v. United States*, 809 F.3d 134, 164 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ("The [Supreme] Court [in *AADC*] emphasized that § 1252(g) is not 'a general jurisdictional limitation,' but rather 'applies only to three discrete actions.'" (quoting *AADC*, 525 U.S. at 482)), *affirmed by an equally divided court sub nom. United States v. Texas*, 579 U.S. 547 (2016); *cf. Camarena v. Dir., Immigr. & Customs Enf't*, 988 F.3d 1268, 1271, 1272–73 & n.2 (11th Cir. 2021) (confirming its narrow reading of section 1252(g) in *Madu*, based on *AADC*, but finding that section 1252(g) barred review of decision to remove pending *discretionary* waiver process).

Hewing close to the Supreme Court's guidance in *AADC* and the First Circuit's holding in *Kong*, this Court will not construe section 1252(g) to immunize an unlawful practice from judicial review. *See also Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 671–72 (1986) ("[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review."). Here, Plaintiffs' claims do not arise from Defendants' discretionary decisions to execute their removal orders. Nor do Plaintiffs challenge their removability. What Plaintiffs challenge is Defendants' authority to effectively depart from the removal orders by designating new countries for removal outside of the immigration proceedings and, in doing so, circumvent Plaintiffs' due-process rights and the carefully crafted

scheme that Congress has set forth.[29]  *See Tazu v. Att'y Gen. U.S.*, 975 F.3d 292, 298 (3d Cir. 2020) ("[W]hen the Act deprives the Attorney General of the discretion to act, a challenge to that lack of statutory authority is not barred as a challenge to the exercise of discretion.").  These assertions are collateral to Defendants' decision to execute Plaintiffs' removal, and thus not subject to section 1252(g)'s jurisdictional bar.  *See Kong*, 62 F.4th at 617.

This Court's decision is in accord with numerous sister courts around the country that have recognized that section 1252(g) shields only discretionary decisions concerning the three stages of the deportation process.  *See, e.g.*, *Abrego Garcia v. Noem*, — F. Supp. 3d —, 2025 WL 1014261, at *7–8 (D. Md. Apr. 6, 2025), *aff'd*, No. 25-1345, 2025 WL 1021113 (4th Cir. Apr. 7, 2025) [hereinafter *Abrego Garcia II*], *aff'd in relevant part sub nom. Noem v. Abrego Garcia*, 604 U.S. —, 2025 WL 1077101 (Apr. 10, 2025) (*per curiam*) [hereinafter *Abrego Garcia III*]; *Gondal v. U.S. Dep't of Homeland Sec.*, 343 F. Supp. 3d 83, 92 (E.D.N.Y. 2018); *Coyotl v. Kelly*, 261 F. Supp. 3d 1328, 1339–41 (N.D. Ga. 2017); *Hovsepian*, 359 F.3d at 1155; *Bowrin*, 194 F.3d at 488. *But see Silva v. United States*, 866 F.3d 938, 941 (8th Cir. 2017) (openly disagreeing with the Supreme Court's reading of the statute, as articulated in *AADC*).  This Court may review the purely

---

[29] During the March 28, 2025 oral argument, Defendants agreed that, in designating additional countries of removal, the Government drew its authority from statute.  March 28, 2025 Tr. at 6:12–7:4.  That implies something beyond mere "execut[ion]" of an order.  *Cf.* 8 U.S.C. 1252(g).  This plain reading of the statute is supported by the relevant regulations, which state that "the order of the immigration judge *does not limit* the authority of the Department of Homeland Security to remove [an] alien to any other country as permitted by section 241(b) of the Act."  8 C.F.R. § 1240.12(d) (emphasis added).  That such authority is not "limit[ed]" by an order does not suggest that the authority is still *pursuant to* that order.

legal question of whether the Constitution and relevant statutes require notice and an opportunity to be heard prior to removal of an alien to a third country.[30]

There is no question that, if eligibility is demonstrated, withholding of removal and CAT protections are mandatory and removal to that country cannot occur. *See* 8 C.F.R. §§ 1208.16(c) (withholding under CAT), 1208.17(a) (deferral of removal under CAT). The only question is what right individuals have, under the Constitution and relevant statutes, to make that showing. This Court has jurisdiction to hear that question.

## III. <u>Motion for Class Certification</u>

Plaintiffs seek to certify a class, which they define as:

> All individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.

Dkt. 4 at 1.

As a threshold matter, limitations on certain class-wide injunctive relief under 8 U.S.C. § 1252(f)(1) do not preclude class certification or otherwise limit the Court's ability to grant Plaintiffs' requested class-wide relief. *See* Dkt. 52 ("Class Cert. Opp.") at 7–10.

---

[30] Defendants' out-of-circuit citations stand, at most, for the proposition that courts cannot indefinitely guarantee the pre-removal completion of certain review processes. *See Rauda v. Jennings*, 55 F.4th 773, 777–78 (9th Cir. 2022) (finding no jurisdiction to halt removal pending appeal of motion to reopen removal proceedings); *Camarena*, 988 F.3d at 1273 (finding no jurisdiction to halt removal pending adjudication of discretionary applications for provisional unlawful presence waivers); *E.F.L. v. Prim*, 986 F.3d 959, 964–65 (7th Cir. 2021) (finding no jurisdiction to halt removal pending adjudication of a petition under the Violence Against Women Act, for which there was no mandate, statutory or otherwise, that adjudication occur prior to removal). Defendants also cite *Foster v. Townsley*, in which the Fifth Circuit held that that section 1252(g) extends to non-discretionary decisions. PI Opp. at 6 (citing *Foster v. Townsley*, 243 F.3d 210, 214 (5th Cir. 2001)). But as Plaintiffs correctly note, the Fifth Circuit subsequently decided *Flores-Ledezma v. Gonzales*, 415 F.3d 375, 380 (5th Cir. 2005), in which the court held that section 1252(g) does not preclude jurisdiction over a challenge to the constitutionality of the statutory scheme, as opposed to a discretionary determination. Insofar as *Tsering v. U.S. Immigr. & Customs Enf't*, 403 F. App'x. 339, 342–43 (10th Cir. 2010), an unpublished decision, relies on *Foster* and its interpretation of *AADC*, this Court views it as an outlier among the circuit courts and will not follow its reasoning.

Plaintiffs seek, among other relief, declaratory judgment. Compl. ¶¶ 118–22. "[S]ection 1252(f)(1) does not strip the lower courts of the power to grant declaratory relief." *Brito v. Garland*, 22 F.4th 240, 250 n.7 (1st Cir. 2021) (citing *Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (addressing the merits of the suit because "[w]hether the [District] [C]ourt had jurisdiction to enter such an injunction [under section 1252(f)(1)] is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' [class-wide] request for declaratory relief")); *accord Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F.4th 606, 625 (9th Cir. 2024); *Make The Road New York v. Wolf*, 962 F.3d 612, 635 (D.C. Cir. 2020); *Alli v. Decker*, 650 F.3d 1007, 1010–13 (3d Cir. 2011); *Gonzalez v. Sessions*, 325 F.R.D. 616, 626 (N.D. Cal. 2018); *Reid v. Donelan*, 297 F.R.D. 185, 193 (D. Mass. 2014), *rev'd on other grounds*, 819 F.3d 486 (1st Cir. 2016), *opinion withdrawn on reconsideration*, 2018 WL 4000993, at *1 (1st Cir. May 11, 2018) (citing *Jennings*, 583 U.S. 281). *But see Hamama v. Adducci*, 912 F.3d 869, 880 n.8 (6th Cir. 2018) (treating the issue as unsettled but suggesting that declaratory relief might be unavailable). Accordingly, certification is proper at least toward that relief.

As to the requested injunctive relief, section 1252(f)(1) simply does not apply. Section 1252(f)(1) generally prohibits lower courts from ordering federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out "the specified statutory provisions," other than on a case-by-case basis. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549–50 (2022). But the class-wide injunctive relief Plaintiffs seek—concerning the availability of CAT protection, *see* Dkt. 6-1—is based on a different statute, the Foreign Affairs Reform and Restructuring Act ("FARRA"). *See Saint Fort v. Ashcroft*, 329 F.3d 191, 195–96 (1st Cir. 2003)

(explaining how the Convention Against Torture was domesticated into federal law), *superseded by statute on other grounds as stated in Hamid v. Gonzales*, 417 F.3d 642, 647 (7th Cir. 2005).[31]

Defendants would have the Court go beyond the plain meaning of the statute to imply a bar to actions that collaterally impact covered parts of the INA. PI Opp. at 5–6. However, section 1252(f)(1) cannot be read so broadly. Starting from first principles, "[t]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." *Yates v. United States*, 574 U.S. 528, 540 (2015) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998)). Here, the title of the section is "Judicial Review of Orders of Removal." 110 Stat. 3009–607 (codified in 8 U.S.C. § 1252). Thus, the text of the statute itself implies that the limitation applies only to cases arising out of such review. *Texas v. United States*, 524 F. Supp. 3d 598, 640–41, 667–68 (S.D. Tex. 2021) ("Section 1252 concerns '[j]udicial review of orders of removal.'" (quoting the title of 8 U.S.C. § 1252)) (reading section 1252 as a whole as "deal[ing] with . . . judicial review of orders of removal" and rejecting the argument that the INA's various limiting provisions collectively "establish Congress's overall intent to preclude judicial review of *most if not all* of DHS's policy decisions with respect to immigration enforcement") (enjoining pause of removals). Other subsections of 1252 concerning review of removal orders are interpreted narrowly to exclude collateral claims. *See Jennings*, 583 U.S. at 294; *Aguilar*, 510 F.3d at 11. The Court sees no basis to graft on Defendants' proposed, additional meaning.

---

[31] It is admittedly confusing that FARRA's provisions are intermingled with the INA's in the U.S. Code. *See generally* 8 U.S.C. § 1231. However, the Ninth Circuit has helpfully clarified that section 1252(f)(1), in its authoritative Statutes at Large version, refers only to "the provisions of chapter 4 of title II [of the INA], as amended by" the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. *Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022). Further, because CAT protections were codified in FARRA in 1998, CAT protections are not covered by section 1252(f)(1)'s bar related only to INA provisions as amended in 1996. *See* FARRA, § 2242(a); *Galvez*, 52 F.4th at 830.

Defendants cite *Aleman Gonzalez* for the proposition that section 1252(f)(1) applies not just to the explicitly covered parts of the statute but to "*the way that [those parts] [are] being carried out.*" PI Opp. at 5 (quoting *Aleman Gonzalez*, 596 U.S. at 550 (emphasis added)) (brackets added). But this puts words into the Supreme Court's mouth—that part of the *Aleman Gonzalez* opinion dealt with an entirely different issue.[32] Indeed, the *Aleman Gonzalez* Court not only explicitly limited its discussion to the "covered immigration provisions," *Aleman Gonzalez*, 596 U.S. at 552,[33] but suggested in dicta that "a court may enjoin the unlawful operation of a provision that is not specified in § 1252(f)(1) even if that injunction has some collateral effect on the operation of a covered provision." *Id.* at 553 n.4 (emphasis removed) (citing *Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007)).

The Fifth Circuit put it well and plainly in *Texas v. United States Department of Homeland Security*, 123 F.4th 186, 209–10 (5th Cir. 2024):

> Texas does not seek to enjoin the operation of any of the provisions listed in § 1252(f)(1). It seeks an injunction only against conduct—namely, cutting or other destruction of its c-wire—unauthorized by § 1357(a)(3). Accordingly, because § 1357(a)(3) is not one of the statutes referenced in § 1252(f)(1), the injunction Texas seeks is not barred. Such an injunction would, at most, have only a "collateral effect on the operation" of the covered statutes (specifically, §§ 1225 and 1226). *Aleman Gonzalez*, 596 U.S. at 553 n.4, 142 S.Ct. 2057. That is especially the case here, where the district court found Defendants were cutting c-wire neither to detain aliens nor to respond to emergencies.
>
> Defendants respond that, in essence, they are the ultimate judges of whether § 1252(f)(1)'s bar applies. They argue *Aleman Gonzalez* prohibits injunctions of *uncovered* statutes that "in the Government's view" impact its ability to enforce the *covered* sections listed in § 1252(f)(1). That is badly mistaken. Congress legislated which sections are covered by § 1252(f)(1). The Executive Branch does not get to

---

[32] *See Aleman Gonzalez*, 596 U.S. 543, 551–52 (2022) (considering whether section 1252(f)(1) applies only to "the covered immigration provisions . . . 'as properly interpreted'" or as "operat[ed]" in practice by the Government).

[33] *See also id.* at 551 ("The respondents in both cases were detained pursuant to § 1231(a)(6), and no one disputes that § 1231(a)(6) is among the provisions the 'operation' of which cannot be 'enjoined or restrained' under § 1252(f)(1).").

propose additions.  *See* U.S. Const. art. I, § 1 (vesting "All legislative Powers" in Congress).

*See also Gonzalez v. ICE*, 975 F.3d 788, 814 (9th Cir. 2020) (holding that "§ 1357(d) is not located in Part IV [of the INA], and thus § 1252(f)(1)'s limitations do not apply"); *O.A. v. Trump*, 404 F. Supp. 3d 109, 158 (D.D.C. 2019) (holding that section 1252(f)(1) does not bar an injunction based on 8 U.S.C. § 1158(b)(1) since it is not a covered provision); *Doe v. Wolf*, 424 F. Supp. 3d 1028, 1044–45 (S.D. Cal. 2020) (finding that section 1252(f)(1) did not bar class-wide injunctive relief with regards to access to counsel during non-refoulement interviews because the relief was not governed by sections 1221–32); *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, — F. Supp. 3d —, 2025 WL 585768, at *13 (D. Md. Feb. 24, 2025) ("Moreover, § 1252(f)(1) does not bar injunctions affecting DHS's authority pursuant to provisions of the INA outside of §§ 1221–1232 'simply because of collateral effects on a covered provision.'" (quoting *Al Otro Lado*, 120 F.4th at 627)).  Thus, the requested class-wide relief, limited only to otherwise removable aliens with potential CAT protection claims, falls outside of section 1252(f)(1)'s bar.

A. **Legal Standard**

Class actions serve as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation and internal quotations omitted).  A court may certify a class only if it finds that the proposed class satisfies all the requirements of Fed R. Civ. P. 23(a) ("Rule 23(a)") and that class-wide adjudication is appropriate for one of the reasons set forth in the relevant subsection of Fed. R. Civ. P. 23(b) ("Rule 23(b)").  *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003).  "Rule 23(a) requires that (1) there be numerosity, (2) there be common questions of law or fact, (3) the class representative's claims be typical of the class, and (4) the representative's

representation of the class be adequate." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 18 (1st Cir. 2008) (citing Fed. R. Civ. P. 23(a)). Plaintiffs seek certification under Rule 23(b)(2), Dkt. 4, which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," Fed R. Civ. P. 23(b)(2). For both Rule 23(a) and 23(b), Plaintiffs must establish each of the elements; failure to establish any element will defeat class certification. *See Smilow*, 323 F.3d at 38.

**B.** **Discussion**

**1.** **23(a)(1) Numerosity**

To satisfy the numerosity requirement, a plaintiff must demonstrate that the class is so numerous that joinder would be "impracticable." Fed. R. Civ. P. 23(a)(1). The requirement presents a "low hurdle," *S. States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 87 (D. Mass. 2007), but "mere speculation as to the number of parties involved is not sufficient to satisfy Rule 23(a)(1)," *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 258 (D. Mass. 2005). "[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009) (citation omitted); *see also Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288, 292 (D. Mass. 2011). The numerosity requirement imposes only a "low threshold," *Garcia-Rubiera*, 570 F.3d at 460, particularly where, as here, Plaintiffs seek only injunctive or declaratory relief, *Reid*, 297 F.R.D. at 189 ("[T]he threshold may be relaxed when a party seeks only declaratory or injunctive relief, since the inclusion of future members increases the impracticability of joinder." (citation omitted)); *see also Gomes v. Acting Sec'y, U.S. Dep't of Homeland Sec.*, 561 F. Supp. 3d 93, 99 (D.N.H. 2021) (certifying a class where "the number of current *and future members* of the putative class exceeds 40 persons" (emphasis added)).

Defendants do not dispute that Plaintiffs have met the numerosity requirement, *see generally* Class. Cert. Opp., and the Court finds this requirement met by Plaintiffs' identification of hundreds of potential class members, Dkts. 8-4, 8-8–23 (identifying individuals with final removal orders who were removed under the challenged policies and practices or are similarly at risk of unnoticed removal).

### 2. 23(a)(2) Commonality

Satisfying the commonality requirement in the instant case is simple and straightforward: Plaintiffs seek a single, common order that Defendants comply with the strictures of due process before deporting them to a county not covered by their final orders of removal. Defendants' arguments to the contrary are uncompelling.

The commonality requirement is met when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy this requirement, a plaintiff must demonstrate that the proposed class's claims "depend upon a common contention," the resolution of which is "central to the validity" of each of the class's claims. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see also Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13, 28–29 (1st Cir. 2019). The commonality requirement is a "low bar." *In Re New Motor Vehicles*, 522 F.3d at 19. Courts have found that "a single common question is sufficient to satisfy the requirements of Rule 23(a)(2)." *Gomes*, 561 F. Supp. 3d at 99; *see also Reid*, 297 F.R.D. at 189.

Defendants argue that the proposed class is overly broad, includes "clear dissimilarities between the proposed class and its proposed representatives," and includes aliens with "different processes and pathways for relief." Class. Cert. Opp. at 11–14. As such, Defendants argue class certification is not appropriate. *Id.*

The commonality requirement is met, notwithstanding purported or actual dissimilarities among named and potential class members, based on the common due-process issue. Due process adheres regardless of the removal context. *See Khouzam v. Att'y Gen.*, 549 F.3d 235, 256–57 (3d Cir. 2008) ("In fact, the basic dictates of due process must be met whether an alien facing removal overstayed a visa, . . . entered the country undetected, . . . or became a legal resident but then committed an enumerated crime." (citations omitted)). That specific circumstances may differ among the various putative class members does not undermine that they all seek notice and an opportunity to be heard, and the opportunity to challenge a policy or practice which allegedly denies it. *See, e.g.*, *Gomes*, 561 F. Supp. 3d at 101 ("[T]he existence of individual differences among putative class members does not foreclose a finding of commonality so long as least one common issue is raised.").

Likewise, that some members may present additional, individualized issues, *e.g.*, return to the United States if unlawfully removed,[34] does not affect commonality. *See Tassinari v. Salvation Army*, — F.R.D. —, 2025 WL 972724, at *7 n.12 (D. Mass. Mar. 26, 2025) ("Defendant's

---

[34] Defendants acknowledge that there are procedures to compel the return of illegally removal individuals. *See* March 28, 2025 Tr. at 17:12–13 ("Yes, Your Honor. There are procedures for that."); *see also* ICE Policy Directive No. 11061.1, § 1, Facilitating the Return to the United States of Certain Lawfully Removed Aliens (Feb. 24, 2012), perma.cc/95AT-VN72 (describing process for facilitating return of certain lawfully removed aliens whose petitions for review are granted after their removal). Courts regularly order the return of wrongfully removed individuals. *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009) (discussing how removed individuals "can be afforded effective relief by facilitation of their return"); *Abrego Garcia III*, 2025 WL 1077101, at *1 (denying application to stay requirement that the Government "facilitate" plaintiff's return after wrongful removal); *Abrego Garcia II*, 2025 WL 1021113, at *2–3 (Thacker, J., concurring) (holding that the court retained jurisdiction because the decision to remove plaintiff to a country for which he had withholding of removal "was not one that was within [the Attorney General's] lawful discretion" and "was not the enforcement of a valid order of removal"); *id*. at *6 ("Nor can the Government be permitted to disclaim any ability to return those it has wrongfully removed by citing their physical presence in a foreign jurisdiction."); *Ramirez v. Sessions*, 887 F.3d 693, 707 (4th Cir. 2018) (directing the Government "to facilitate [plaintiff's] return to the United States" from El Salvador); *Gordon v. Barr*, 965 F.3d 252, 261 (4th Cir. 2020) (similar); *Nunez-Vasquez v. Barr*, 965 F.3d 272, 287 (4th Cir. 2020) (directing the Government "to return [plaintiff] to the United States"); *Orabi v. Att'y Gen.*, 738 F.3d 535, 543 (3d Cir. 2014) (similar). Here, the putative class members *already* have been awarded withholding of removal, and as discussed below, *infra* Section IV(B)(1), Plaintiffs are likely to succeed on the merits that they are and were entitled to due process in order to assert their statutory rights to seek CAT protections prior to removal, making such removals without due process wrongful.

identified individualized issues really boil down to one common question."). "Ultimately, the gravamen of Defendant[s'] challenges on commonality really goes not to whether common issues exist but rather to whether common issues predominate over individual ones; this is not a concern for a 23(b)(2) class [seeking injunctive or declaratory relief], as predominance is a requirement for certifying a class only under 23(b)(3)." *Id.* at *7 (citing *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 11 (D. Mass. 2010) (reviewing First Circuit case law)).

"Plaintiffs in this case have identified a single alleged practice"—Defendants' system-wide policy or practice of designating aliens for removal to a third country without first providing those aliens notice and an opportunity to apply for protection from removal to that country—"that provides the basis for every class member's injury." *Ramirez v. ICE*, 338 F. Supp. 3d 1, 42–50 (D.D.C. 2018) (certifying class of immigrant teens challenging transfers to ICE custody). Regardless of differences in the removal procedures applicable to each class member, they all seek to establish their right to due process.[35] *See Savino v. Souza*, 453 F. Supp. 3d 441, 451 (D. Mass. 2020) (determining "that the admittedly significant variation among the Detainees does not defeat commonality"); *Quadrelli v. Moniz*, 2020 WL 3051778, at *5 (D. Mass. June 8, 2020) (following courts that have certified classes of individuals "who have alleged a general risk of harm due to a

---

[35] The Court rejects Defendants' implicit argument that allegations of due-process violations cannot ever sustain a class action. Class. Cert. Opp. at 14. While "due process is flexible" and can vary depending on the situation, *Matthews*, 424 U.S. at 321, the basics are clear: "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner," *id.* at 333; *see also id.* at 348 ("The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'" (citation omitted)); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."). As such, courts have certified classes asserting due-process claims under Rule 23(b), without raising commonality concerns. *See* Charles Alan Wright & Arthur R. Miller, 7AA *Federal Practice and Procedure* § 1776.1 (3d ed.) (collecting cases); *Garcia-Rubiera*, 570 F.3d at 456–58, 461 (remanding with instructions to certify, under Rule 23(b)(2), a class challenging, among other things, a lack of notice under the Due Process Clause).

policy or practice, even if there might additionally be a unique or distinct impact as to an individual putative class member").

Since Plaintiffs have identified a single, common question at the heart of the claims, commonality has been satisfied. *See Gomes*, 561 F. Supp. 3d at 99 ("[A] single common question is sufficient to satisfy the requirements of Rule 23(a)(2)."). Answering the common legal question of whether Defendants must afford aliens with due process (and of what that due process consists) prior to removal to a third country will "drive the resolution of the litigation." *Ramirez*, 338 F. Supp. 3d at 45 (cleaned up).

Thus, the Court finds that Plaintiffs have satisfied the commonality requirement under Rule 23(a)(2).

### 3.      23(a)(3) Typicality

The typicality requirement mandates that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality does not require that all putative class members share identical claims or defenses. *In re Credit Suisse-AOL Secs. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008) (citing *Swack*, 230 F.R.D. at 260); *see also DaSilva v. Border Transfer of MA, Inc.*, 296 F. Supp. 3d 389, 405 (D. Mass. 2017) ("Even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." (quotation omitted)). Instead, typicality is established if the claims of the class representative "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members, and . . . are based on the same legal theory." *Garcia-Rubiera*, 570 F.3d at 460 (citation omitted).

Defendants argue that "[t]he proposed class lacks typicality for the same reasons it lacks commonality" and that "the class representatives are *not* part of the proposed class and do *not*

possess the same interest or suffer the same injury as the proposed class members because they cannot demonstrate they will be removed absent any notice or opportunity to assert a fear-based claim." Class Cert. Opp. at 15–16 (emphases in original).[36]

Typicality is satisfied here for largely the same reasons that commonality is satisfied. The named Plaintiffs and putative class members all share an identical interest in an injunction mandating due-process protections prior to their removal to a third country. Defendants have taken the position that there is *no* due process entitled to any alien, under any method of removal, prior to removal to a third country regardless of any potentiality that such an alien will be tortured or murdered upon arrival. *See* March 28, 2025 Tr. at 10:17–11:1 ("THE COURT: In this posture, where it is the discretionary decision of the department that's changing the third-party designation, does the person who's going to be deported have a right to be informed and be given an opportunity to be heard as to the dangerousness of that third country designation? MS. LARAKERS: DHS's position is no. THE COURT: They don't have to be told anything and given no opportunity to be heard? MS. LARAKERS: DHS's position is no."). Between Defendants' representations to the Court and the Court's ultimate finding that the procedures outlined in the March Guidance do not provide adequate due process, *see infra* at 42–43, the Court finds that the named and unnamed Plaintiffs alike share an identical interest in challenging Defendants' alleged practice of removing individuals to third countries without notice and an opportunity to be heard, and, as such, satisfy the typicality requirement under Rule 23(a)(2).

---

[36] Defendants also argue that "Plaintiffs[] attempt to meet typicality by expanding the description of their class" to apply the class to "to any alien with a final order of removal under the three named removal statutes regardless of what procedures DHS applied to their removal to a third country." Class. Cert. Opp. at 15. However, Plaintiffs have asserted a consistent class definition throughout this case, and by its plain language, the class definition applies only to those aliens who have been or will be attempted removed to a third country *without meaningful notice and opportunity to contest the removal*. Thus, whether an alien is a part of the class inherently depends on whether the alien received said notice and opportunity to be heard, *i.e.*, on the Government's own inaction and inaction.

### 4.  23(a)(4) Adequacy of Representation

The adequacy requirement is met when the representative parties will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Adequacy is satisfied if (1) there is no conflict between the interest of the named Plaintiffs and the class members and (2) counsel chosen by the named Plaintiffs are qualified and able to litigate the claims vigorously.[37] *S. States Police*, 241 F.R.D. at 88 (citing *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985)). Merely lacking identical interest, however, is not enough for a representative party to be found inadequate. *Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 345–46 (1st Cir. 2022) (citing *Cohen v. Brown Univ.*, 16 F.4th 935, 945 (1st Cir. 2021)).

Defendants argue that "Plaintiffs fail to meet the adequacy requirement for the same reasons Plaintiffs fail to meet the commonality and typicality requirements." Class Cert. Opp. at 16. But the adequacy requirement looks to whether the named Plaintiffs will fairly and adequately protect the interests of the proposed class. *See S. States Police*, 241 F.R.D. at 88. There is nothing in the record to suggest that the named Plaintiffs seek any unique or additional benefit from this litigation that may make their interests different from or adverse to those of absent class members. *Cf. Amchem*, 521 U.S. at 626–27 (holding that adequacy requirement was not met where named plaintiffs stood to benefit disproportionately and at the expense of other potential class members). Thus, the Court finds that Plaintiffs have satisfied the adequacy requirement under Rule 23(a)(2).

---

[37] Defendants do not contest the adequacy of Plaintiffs' counsel. *See* Class Cert. Opp. at 16.

### 5.    23(b)(2) Injunctive or Declaratory Class

Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Wal-Mart Stores*, 564 U.S. at 360 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)). "[C]ivil rights actions . . . where a party charges that another has engaged in unlawful behavior towards a defined group, are prime examples of Rule 23(b)(2) classes." *Reid*, 297 F.R.D. at 193 (quotation omitted).

Defendants' first set of arguments goes mainly to whether the named Plaintiffs have valid claims. *See* Class Cert. Opp. at 17 (arguing that O.C.G. received notice of his removal and had an opportunity to assert fear-based claims); *id.* (arguing that E.F.D. and M.M. have an adequate remedy in a motion to reopen); *id.* at 17–18 (arguing that the claims of D.V.D. and M.M. are speculative and unripe). But these arguments, which go to the merits of the individual claims, are inappropriate to consider on a motion for class certification. "Although . . . a court's class-certification analysis . . . may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (quoting *Wal-Mart Stores*, 564 U.S. at 351). To the extent Defendants' implied argument is that these individual infirmities bespeak some sort of "fatal similarity" common to the whole

proposed class, "[s]uch a contention is properly addressed at trial or in a ruling on a summary-judgment motion." *Id.* at 470.[38]

More broadly, Defendants argue that, "[t]o the extent Plaintiffs are entitled to some additional procedures under the Due Process Clause, those procedures would be different for each alien depending on the underlying facts and circumstances of their case." Class Cert. Opp. at 18. But Defendants have not provided the Court with a single example of how an "underlying fact" and/or "circumstance" might lead to different procedural minima for one individual versus another. *Cf. Reid v. Donelan*, 17 F.4th 1, 9 (1st Cir. 2021) (finding certification improper where district court recognized that "relief must be adjudicated on an individual basis"). Defendants' own contention that—if due process applies to third-country removals—the March Guidance is sufficient, PI Opp. at 8, recognizes that it is possible to establish a baseline for all putative class members. The Court does not find that the claims here "hinge on the individual circumstances of each class member." *Reid*, 17 F.4th at 11. Rather, Defendants have taken a broad position, subject to class-wide challenge.

In sum, Plaintiffs challenge a policy or practice that impacts all putative class members: failing to provide meaningful notice and opportunity to present a fear-based claim before executing removal to a third country. In doing so, Plaintiffs seek injunctive and declaratory relief that applies to the class as a whole, satisfying Rule 23(b)(2).

---

[38] The Court instead addresses these arguments in its analysis of Plaintiffs' motion for a preliminary injunction. *See infra* Section IV(B)(1).

## IV. Preliminary Injunction

### A. Legal Standard

"[T]he issuance of preliminary injunctive relief is 'an extraordinary and drastic remedy that is never awarded as of right.'" *Howe v. U.S. Bank Nat'l Ass'n as Tr. for RMAC Tr. Series 2016-CTT*, 440 F. Supp. 3d 99, 102 (D. Mass. 2020) (quoting *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Of the four factors, likelihood of success "weighs most heavily" in the analysis. *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020).

In deciding a motion for preliminary injunction, "[t]he court may accept as true 'well-pleaded allegations [in the complaint] and uncontroverted affidavits.'" *C&W Facility Servs. Inc. v. Mercado*, 2018 WL 4854630, at *2 (D. Mass. Oct. 5, 2018) (quoting *Rohm & Haas Elec. Materials, LLC v. Elec. Cirs. Supplies, Inc.*, 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010)). "The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary injunction." *Bos. Taxi Owners Ass'n, Inc. v. City of Bos.*, 84 F. Supp. 3d 72, 78 (D. Mass. 2015) (citing *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).

### B. Discussion

#### 1. Likelihood of Success

Plaintiffs have established that they are likely to succeed in showing that Defendants have a policy or practice of executing third-country removals without providing notice and a meaningful

opportunity to present fear-based claims, and that such policy or practice constitutes a deprivation of procedural due process.

"To establish a procedural due process violation, the plaintiff 'must identify a protected liberty or property interest and allege that the defendants, acting under color of state law, deprived [him] of that interest without constitutionally adequate process.'" *Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1, 13 (1st Cir. 2011) (quoting *Aponte–Torres v. Univ. of P.R.*, 445 F.3d 50, 56 (1st Cir. 2006)). "The basic purport of the constitutional requirement is that, before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir. 1990) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

Congress clearly established the right to deferral or withholding of removal based on a legitimate fear-based claim. *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005) (explaining that individuals who "face persecution or other mistreatment in the country designated" as their place of removal "have a number of available remedies," by statute, regulation, and under international law, to "ensur[e] their humane treatment").

More generally speaking, "'[i]t is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." *Trump v. J.G.G.*, 604 U.S. —, 2025 WL 1024097, at *2 (Apr. 7, 2025) (*per curiam*) [hereinafter *J.G.G. III*] (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). As all nine Supreme Court justices agreed less than two weeks ago, this means that "notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek . . . relief in the proper venue before such removal occurs." *Id.*; *see also id.* (Kavanaugh, J., concurring) ("[A]ll nine Members of the Court agree that judicial review

is available."); *id.* at *6 (Sotomayor, J., dissenting) ("That means, of course, that the Government cannot usher any detainees . . . onto planes in a shroud of secrecy.").

Likewise, there can be no disagreement that the same constitutional guarantees apply to withholding-only relief. *Guzman Chavez*, 594 U.S. at 557 (Breyer, J., dissenting) ("And all here agree that the aliens are legally entitled to seek . . . withholding-only relief." (citing *Fernandez-Vargas v. Gonzalez*, 548 U.S. 30, 35 n. 4 (2006))); *Abrego Garcia III*, 2025 WL 1077101, at *2 (Sotomayor, J., concurring) (explaining that the Government has an "obligation to provide [the plaintiff who was subject to an order of removal] . . . notice and an opportunity to be heard" and ensure compliance with its "obligations under [CAT]" prior to removal); *see also Andriasian v. I.N.S.*, 180 F.3d 1033, 1041 (9th Cir. 1999) (finding that "last minute designation" of removal country during formal proceedings "violated a basic tenet of constitutional due process: that individuals whose rights are being determined are entitled to notice of the issues to be adjudicated, so that they will have the opportunity to prepare and present relevant arguments and evidence"); *Kossov v. INS*, 132 F.3d 405 (7th Cir. 1998) (due-process violation to order deportation to Russia after a claim of asylum as to Latvia where uncounseled noncitizen was provided insufficient notice of Russia possibility).

The Court rejects Defendants' argument that aliens have already received, during their initial removal proceedings, all the process to which they are entitled, so as to justify providing no additional process prior to third-country removal. *See* April 10, 2025 Rough Tr. at 11:1–4 ("MR. ENSIGN: Your Honor, where they could have raised it previously and did not do so, the Due Process Clause does not require an additional procedural opportunity to raise [it] in . . . that context."). Defendants argue that aliens could have brought up, during their initial removal proceedings, all the countries where they have concerns that they will be tortured. *See, e.g.*,

April 10, 2025 Rough Tr. at 4:13–16 ("[MR. ENSIGN:] They also previously would have had an opportunity to raise it during their initial removal proceedings and they would be asked on their [I-589] form if they have fear of returning anywhere."). This is both impossible as a practical matter, since the immigration court does not normally consider claims about countries not proposed as a country of removal,[39] and fails to consider that conditions change in countries change over time.[40] Listing all the countries in the world as to which an individual might have a reasonable fear is also impractical: doing so would potentially require, for example, a person with a same-sex sexual orientation to list, at least, all 64 countries where such an orientation is illegal such that the individual fears torture. *See Homosexuality: The countries where it is illegal to be gay*, BBC (Mar. 31, 2023), https://perma.cc/32KN-RH6Q. Indeed, the Assistant to the Solicitor General, arguing before the Supreme Court on the topic of third-country removals less than a month ago, affirmatively stated that "[w]e would have to give the person notice of the third country and give them the opportunity to raise a reasonable fear of torture or persecution in that third country," even where that individual was already subject to an order of removal.[41]

Even without that statement, the claims at issue concern removal to countries that were *not ruled upon* in the initial proceedings and are therefore not covered by the removal order. As discussed above, the Court disagrees with Defendants' assertion that the theoretical option of a motion to reopen provides a sufficient remedy. *See supra* at 14–18; *see also Sadychov*, 565 F.

---

[39] *See supra* at 16–17 & notes 17, 24 (discussing the non-viability of preemptive claims).

[40] An alien can remain in the United States on an Order of Supervision for decades after being granted withholding. *See* April 10, 2025 Rough Tr. at 15:24–16:1 ("THE COURT: But some people have been granted withholding for 20 years, right? MS. REALMUTO: Exactly."); *see also* Compl. ¶¶ 75–76 (alleging that E.F.D. was granted CAT protection in 2018 and had been released from immigration custody until he was re-detained in March 2025). Country conditions can change dramatically, especially over decades. *See, e.g.*, Designation of Afghanistan for Temporary Protected Status, 87 Fed. Reg. 30976 (May 20, 2022) (providing Temporary Protected Status designation to Afghanistan in May 2022, after Taliban returned to power in August 2021).

[41] *Supra* note 2.

App'x at 651 ("[A]n applicant is not entitled to have the agency adjudicate claims of relief that relate 'to a country that nobody is trying to send them to.'" (quoting *She*, 629 F.3d at 962)); Dkt. 59-12 at 4–5 ("If the United States government were to remove Respondent to El Salvador under a separate authority, that is outside the jurisdiction of this Court to adjudicate and/or analyze. Respondent's relief would be sought in Federal court, not Immigration Court.").[42]

The Court finds it likely that Defendants have applied and will continue to apply the alleged policy of removing aliens to third countries without notice and an opportunity to be heard on fear-based claims—in other words, without due process. Defendants have repeatedly argued that they have no obligation to provide any process whatsoever when newly designating a third country for removal. *See, e.g.*, March 28, 2025 Tr. at 10:17–11:1; April 10, 2025 Rough Tr. at 9:5–8, 10:19–11:4. Defendants' own avowed position and the numerous declarations Plaintiffs have

---

[42] *See also* Dkt. 8-8 ¶ 9 (motion to reopen denied); Dkt. 8-18 ¶ 5 (same); Dkt. 8-11 at 5–6 (same); Dkt. 59-12 ¶¶ 12–18 (same); Dkt. 59-13 at 4 (same).

provided[43] substantiate both the prior and future use of Defendants' policy of providing no notice prior to third-country removal.[44]

Nor do the procedures outlined in DHS's March Guidance satisfy due process. The March Guidance provides no process whatsoever to individuals whom DHS plans to remove to a country from which the United States has received blanket diplomatic assurances. Dkt. 43-1 at 1–2. Defendants are, of course, correct that the Court may not question the substance of diplomatic assurances endorsed by the Executive. *See* PI Opp. at 11. However, the Court may inquire into the overall process and whether such assurances, on their own terms, satisfy the Constitution. *See Khouzam*, 549 F.3d at 259 (finding that lack of individualized determination violated due process, notwithstanding diplomatic assurance).

Blanket diplomatic assurances do not address DHS's obligation to undertake an individualized assessment as to the sufficiency of the assurances, as required under the statutory

---

[43] Notably, the parties contest whether O.C.G. received any substantial notice or a meaningful opportunity to present a fear-based claim prior to his removal to Mexico. *Compare* Compl. ¶¶ 85–86 (alleging that no notice or opportunity to be heard was provided), *and* Dkt. 8-4 ¶¶ 8–10 (declaration of O.C.G. asserting same), *with* Dkt. 31-1 ¶ 13 (declaration of Brian Ortega, Assistant Field Office Director of the ICE ERO Phoenix Field Office, asserting based on hearsay that notice was provided on February 21, 2025, by "ERO" and that O.C.G. denied fear of removal). Given O.C.G.'s sworn declaration—rebutted only by a hearsay declaration—the Court finds it likely that O.C.G. was not provided sufficient process prior to removal.

[44] Defendants argue that the claims of D.V.D. and M.M. are speculative and unripe because D.V.D. and M.M. have not yet been detained or notified of any impending third-country removal. Class. Cert. Opp. at 17–18. *But see* Compl. ¶ 71 (alleging that M.M. was informed by an ICE official that she would be deported in the immediate future). There, so to speak, lies the rub—according to Defendants, an individual must await notice of removal before his claim is ripe, even where the claim is that there is no notice. But once an individual is removed, Defendants argue, there is no jurisdiction. *See* Class Cert. Opp. at 11–12.

Having granted class certification, the individual cases of D.V.D. and M.M. are less dispositive as to the issue of likelihood of success. Nevertheless, insofar as they may represent some portion of the class, the Court notes that it does not find such cases unripe. Ripeness concerns both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017) (citing *Texas v. United States*, 523 U.S. 296, 300–01 (1998)). Here, both tests indicate justiciability. As Plaintiffs challenge Defendants' policy and practices, rather than the putative class members' individual removability, no further facts are necessary for judicial review. *See Pustell v. Lynn Pub. Scs.*, 18 F.3d 50, 52 (1st. Cir. 1994) (finding claim ripe where "[n]o further factual development is necessary for us to resolve the question at issue, namely, whether the policy . . . is constitutional"). Likewise, Plaintiffs "suffer the harm of substantial uncertainty if we put off resolving their constitutional claims." *Id.*

and regulatory framework. *See* 8 C.F.R. § 1208.18(c)(1) ("The Secretary of State may forward to the Attorney General assurances that the Secretary has obtained from the government of a specific country that ***an*** alien would not be tortured there if ***the*** alien were removed to that country." (emphases added));[45] *see also Niz-Chavez v. Garland*, 593 U.S. 155, 161 (2021) (examining the "ordinary meaning" of statutory text and finding that "[t]o an ordinary reader—both in 1996 and today—'a' notice would seem to suggest just that: 'a' single document").

Moreover, blanket assurances offer no protection against either torture by non-state actors or chain refoulement, whereby the third country proceeds to return an individual to his country of origin. *See, e.g.*, Compl. ¶¶ 68–69 (detailing domestic violence concerns that led to withholding of removal designation); Dkt. 8-2 ¶¶ 3–4, 7–8, 13 (same). Yet these circumstances can trigger protections under CAT no less than threats coming from state actors. 8 C.F.R. § 1208.18(a)(1); *see also Murillo Morocho v. Garland*, 80 F.4th 61, 71 (1st Cir. 2023) (vacating decision denying CAT protection where the Board of Immigration Appeals failed to properly consider risk of torture by non-state actors).

Even if such blanket assurances might, in some individual cases, satisfy due process, the March Guidance precludes any further review prior to removal. Dkt. 43-1 at 1–2 (providing noncitizens "will be removed without the need for further procedures"). There can be no right without a remedy. *Marbury v. Madison*, 5 U.S. 137, 163 (1803). Without meaningful review, the rights Congress has provided are little more than dead letter.

---

[45] The Department of Justice has previously recognized its obligation to provide a case-by-case, individualized process for seeking and assessing the reliability of diplomatic assurance determinations. *See Oversight of the USA PATRIOT Act: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 10 (2005) ("LEAHY: What do you think that the assurances we get from countries that are known to be torturers, when they say, 'Well, we won't torture this person you're sending back' – do you really think those assurances are credible? GONZALES: I think, Senator, that's a difficult question that requires, sort of, a case-by-case analysis. . . . Well, again, Senator, we take this obligation very, very seriously. And we know what our legal obligations are. We know what the directive of the president is. And each case is very fact-specific.").

It simply cannot be, as Defendants contend, that the Government can "decide right now that someone who is in [] custody is getting deported to a third country, give them no notice and no opportunity to say, 'I will be killed the moment I arrive there,' and, as long as the [Government] doesn't already know that there's someone standing there waiting to shoot him, that's [] fine." *See* March 28, 2025 Tr. at 29:12–18 ("In short, yes."). Defendants' obligations under CAT and the Due Process Clause require more. Plaintiffs have demonstrated a likelihood of success on the merits.

## 2. Irreparable Harm

"'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 381 (D. Mass. 2020) (quoting *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004)). "It 'most often exists where a party has no adequate remedy at law.'" *Id.* (quoting *Charlesbank Equity Fund II*, 370 F.3d at 162).

The irreparable harm factor likewise weighs in Plaintiffs' favor. Here, the threatened harm is clear and simple: persecution, torture, and death. It is hard to imagine harm more irreparable.

Defendants' argument that this Court has no jurisdiction over already-removed aliens only bolsters Plaintiffs' argument toward finding irreparable harm. *See* Class Cert. Opp. at 11–12. Defendants contend that they may remove aliens to third countries with no possibility for review. *Id.* It is undoubtedly "irreparable injury to reduce to a shell game the basic lifeline of due process

before an unprecedented and potentially irreversible removal occurs." *J.G.G. II*, 2025 WL 914682, at *30 (Millett, J., concurring).

Thus, Plaintiffs have demonstrated a likelihood of irreparable harm.

### 3. Balance of Equities and Public Interest

Finally, the Court considers the balance of the equities and the public interest. "These two inquiries merge in a case like this one, where the Government is the party opposing the preliminary injunction." *Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). In cases implicating removal, "there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436. However, there is also "a public interest in prompt execution of removal orders." *Id.*

"To begin with, the Plaintiffs' likelihood of success on the merits lightens [Defendants'] stated interests." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022). The Supreme Court has confirmed that "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021); *see also NFIB v. Dep't of Labor*, 595 U.S. 109, 120–21 (2022) (staying an illegal vaccine mandate even though the Government said the mandate would save more than 6,500 lives); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952) (affirming district court's preliminary injunction of an illegal executive order even though a wartime president said his order was "necessary to avert a national catastrophe").

Here, the Court has found it likely that these deportations have or will be wrongfully executed and that there has at least been no opportunity for Plaintiffs to demonstrate the substantial harms they might face. The Court finds that these circumstances countervail the public's normal

and meaningful "interest in prompt execution." *See Nken*, 556 U.S. at 436. Thus, the final two factors support issuance of relief.

### 4.     **Limitations of Relief**

"[An] injunction should issue only where [it is] essential in order effectually to protect . . . rights against injuries otherwise irremediable." *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)). Here, the "irremediable" injury would be deportation without meaningful opportunity to present a claim based on fear of persecution, torture, or death.

Accordingly, the Court circumscribes its remedy and declines, at this time, to require the full extent of process Plaintiffs propose. Instead, the Court orders that, prior to removing any alien to a third country, *i.e.*, any country not explicitly provided for on the alien's order of removal, Defendants must: (1) provide written notice[46] to the alien—and the alien's immigration counsel, if any[47]—of the third country to which the alien may be removed, in a language the alien can understand; (2) provide meaningful opportunity for the alien to raise a fear of return for eligibility

---

[46] Written notice comports with the traditional standards of due process. *See Matthews*, 424 U.S. at 348 ("The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'" (citation omitted)); *Mullane*, 339 U.S. at 313, 315 ("Personal service of written notice within the jurisdiction is the classic form of notice always adequate in any type of proceeding. . . . [W]hen notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected."). The Court's sense of what fairness requires is further supported by the Government's own internal documents. *See* Dkts. 1-2 (2001 draft Form 1-913 that would provide written notice prior to third-country removal and require motion to reopen to be filed within fifteen days of being served with notice), 1-3 (2020 draft model notice that would provide written notice prior to removal to country other than designated country of removal and that provided that "DHS w[ould] not oppose [the alien's] filing of a motion to reopen with the Immigration Court" within fifteen days of being served with such notice).

[47] *See* 8 C.F.R. § 292.5 ("Whenever a person is required by any of the provisions of this chapter to give or be given notice; to serve or be served with any paper other than a warrant of arrest or a subpoena; to make a motion; to file or submit an application or other document; or to perform or waive the performance of any act, such notice, service, motion, filing, submission, performance, or waiver shall be given by or to, served by or upon, made by, or requested of the attorney or representative of record, or the person himself if unrepresented.").

for CAT protections; (3) move to reopen the proceedings if the alien demonstrates "reasonable fear";[48] and (4) if the alien is not found to have demonstrated "reasonable fear," provide meaningful opportunity, and a minimum of 15 days,[49] for that alien to seek to move to reopen immigration proceedings to challenge the potential third-country removal.

With respect to the return of O.C.G.,[50] the Court recognizes that whether he received notice at all, let alone meaningful notice, is hotly contested. Until the factual dispute of whether he received notice is resolved, the Court will not order the return of O.C.G. A mandatory injunction, as would be required, "alters rather than preserves the status quo," and is thus subject to an even more heightened level of legal and factual scrutiny. *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) (citing *Massachusetts Coal. of Citizens with Disabilities v. Civ. Def. Agency & Off. of Emergency Preparedness of Mass.*, 649 F.2d 71, 76 n.7 (1st Cir. 1981)). Instead, Plaintiffs may renew their motion with regards to the return of O.C.G.

---

[48] "Reasonable fear" is the most stringent standard for screenings applied in the initial removal context, meaning the alien must show the highest and most credible level of fear required at the screening stage to garner relief. *Compare* 8 CFR § 208.31 (using "reasonable fear" as the screening standard for aliens removeable under certain INA provisions), *with* 8 CFR § 208.16 (using "credible fear" as the screening standard for aliens removeable under other INA provisions); *see also Reasonable Fear Screenings*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/reasonable-fear-screenings (last updated Jan. 24, 2025) ("Those who are found to have a reasonable fear of persecution or torture are then given an opportunity to seek withholding of removal or deferral of removal before an Immigration Judge."). While Defendants propose applying the "more likely than not" standard, *see* April 10, 2025 Rough Tr. at 33:2–4, that would require an alien to demonstrate full entitlement to CAT protections at merely the screening stage. *See* 8 C.F.R. § 208.17(a).

[49] The Court has been forced to decide on an appropriate time limit because Defendants were unable, unwilling, or incapable of meaningfully engaging in a discussion about what process was required to provide aliens with a meaningful opportunity to contest a finding that their fear was reasonable. *See* April 10, 2025 Rough Tr. at 48:10–13 ("THE COURT: What's an appropriate number of days? MR. ENSIGN: Your Honor, our -- we think it should be shorter than [21 days]. I'm not prepared to say exactly what that period is."). To tailor its preliminary injunction as narrowly as possible, the Court has chosen to use the timeframe that Defendants proposed when developing their own forms for this scenario. *Supra* note 46. Though these forms may never have been formally adopted, they would appear to, at a minimum, reflect the agencies' determination—on two separate occasions spanning a period of nearly 20 years—of an appropriate period of time during which an alien should be permitted to object to an adverse determination.

[50] It is clear that courts can still "grant relief once a deportee crosses the border." *Abrego Garcia III*, 2025 WL 1077101, at *2 (Sotomayor, J., concurring) (citing *Rumsfeld v. Padilla*, 542 U. S. 426, 447, n. 16 (2004); *Boumediene v. Bush*, 553 U. S. 723, 732 (2008)).

after discovery.  The Court orders the parties to conduct expedited discovery on this issue and file a status update addressing a proposed discovery plan by April 25, 2025.[51]

### C.    <u>Bond</u>

The Court exercises its discretion to waive the requirement to post a bond under Rule 65(c). *See, e.g.*, *Int'l Assoc. of Machinists and Aerospace Workers v. Eastern Airlines*, 925 F.2d 6, 9 (1st Cir. 1991) (finding "ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond"); *see also da Silva Medeiros v. Martin*, 458 F. Supp. 3d 122, 130 (D.R.I. 2020) (waiving the bond requirement where it would pose a hardship on petitioners and unduly restrict the federal rights at issue); *Pineda v. Skinner Services, Inc.*, 22 F.4th 47, 57 (1st Cir. 2021) (concluding that district court did not abuse its discretion when it did not require low-wage laborers to post a bond).

## V.    <u>Conclusion</u>

For the foregoing reasons, Plaintiffs' motion for class certification (Dkt. 4) is GRANTED and motion for a preliminary injunction (Dkt. 6) is GRANTED in part.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated:  April 18, 2025             Judge, United States District Court

---

[51] The Court notes that Plaintiffs have not requested injunctive relief based on the right to make claims under 8 U.S.C. § 1231(b)(3)(A) beyond the named Plaintiffs.  This is consistent with the limitation on certain relief under 8 U.S.C. § 1252(f)(1).  *See Galvez*, 52 F.4th at 829–30.  The Court thus limits its Order as to statutory claims to apply only to the named Plaintiffs while ensuring CAT protection to all similarly situated individuals.